Good morning, Your Honor. May it please the Court, I'm Robert Leventhal on behalf of the appellants, the hospitals in question. I think that the case that we have before you is really a very simple case, both legally and factually. We're not here trying to expand Chevron deference or deal with the intricacies of when it's applicable or when it's not. What we're here for is a case in which CMS chose a standard. It articulated a standard under which it was going to review the rates in question, and it said that the standard was that the rates had to be sufficient to ensure that Medicaid beneficiaries had at least as good access to care as the general public in the geographic area. Counsel, it would help me a lot if you would give the best argument as to why managed pharmacy care versus Sebelius is distinguishable. You've got a general part of the statute and the specific part. I think that's what you're going to tell me. But is that the best argument, why that's distinguishable? Two reasons, Your Honors. One reason is that the pharmacy care was basically addressing an argument that cost was something that had to be considered under the old orthopedic standard. The court rejected that argument and basically accepted CMS's argument that they're going to look at the results and not at what analysis is done. They can use whatever standard they want as long as they ensure that the result is that a Medicaid beneficiary has at least as good access to care as a member of the general population. And so that's what they basically found, and we're not challenging that. The services at issue in the pharmacy case are different than the services at issue here, and the evidence that CMS relied on in the pharmacy case was different than the evidence that CMS relied on here. There's about a 2,000-page administrative record that contains evidence relating to a variety of services where CMS was asked to approve rate decreases. Counsel, is there any reference in the record showing that the Secretary considered whether the proposed SPA would assure that Medi-Cal beneficiaries would have equal access to care and services as the general public? There's no specific evidence showing that they did any independent analysis of that. They have boilerplate in their letters saying we considered the correct factors and that sort of thing, but the evidence in the administrative record regarding the actual evidence before them regarding access to care is all in two pages of the record. And it's in Volume 7 of the excerpts of record, and it's in pages ER 1597 through 1598. And this is not something that we're just claiming and CMS is denying. This is what CMS cites, too, as well as us. And so this is what's in the record. And so what needs to be done is the court needs to look at this two pages and see is there anything in there upon which a reasonable person could conclude that the Medicaid beneficiaries have the same access to care as the general public. And we believe in this case there's not, and there's two reasons for that. One reason is there's nothing there about the access that the general public has. And so if you just have information about the access that beneficiaries of Medicaid have, you know what their access is, but you can't tell if it's lesser than the general public, greater than the general public, or the same as the general public. How are we supposed to treat the Emergency Medical Treatment and Labor Act? That makes CMS's reliance on this even worse, and it makes the managed pharmacy care case even more distinguishable. The EMTALA, the Emergency Medical Treatment and Active Labor Act, is a law that requires hospitals to treat any patient that comes to the hospital with an emergency medical condition. And so because of that, if someone shows up with absolutely no insurance or no way of paying, if they show up at a hospital with an emergency room and they have an emergency medical condition, the hospital is required to treat them, even though it knows it won't get paid. And how should the secretary interpret that? I mean, obviously the hospital has no choice, and if someone without resources goes to the hospital emergency ward and is treated, are they, for purposes of the analysis that you claim is required, treated as if they are part of the general public? Is it a special subcategory? How is that to be treated? Well, I think if they're not a Medicaid beneficiary, they're a member of the general public. If they are a Medicaid beneficiary, then the secretary needs to look at evidence as to whether the rates are adequate, other than whether this person got treated, because that person would have gotten treated even if there was no Medicaid program, and so therefore the fact that they came and got treatment doesn't indicate that the rates are adequate. In Los Angeles County, I don't know what the number is, but there were many emergency wards that shut down. Indeed, hospitals overall shut down because of the impact of EMTALA. How, if at all, should that be factored into the secretary's analysis of equal access? Well, I would argue that the secretary should be even more careful here, because the purpose of the Medicaid Act is to provide medical care for indigent people that qualify for Medicaid at the expense of the state and federal government. It's not to put hospitals out of business or to penalize providers. And what you have here is a situation where because of EMTALA, a hospital outpatient department, an emergency room, is the site of last resort for people who don't have insurance or who have like Medicaid, which many people would argue doesn't actually provide enough reimbursement for doctors that they can get good access with doctors. And there's actually evidence in the administrative record, CMS's own admission that we cited, saying that a lot of people do go to emergency rooms who are covered by Medicaid and that that could be evidence of an access problem. And so basically if the rates overall are inadequate, those people end up in the hospital emergency room and put an even greater burden on the hospitals unless the hospital rates for the emergency room are adequate. And so they need to look at more. And here what they looked at, one of the main factors they looked at, is the percentage of emergency rooms or of hospitals that accepted one or more Medicaid patients. Well, that doesn't mean anything, because every hospital with an emergency room should be accepting one or more Medicaid patient. And so even if the rates were set at zero, you would still have all the hospitals with emergency rooms treating one or more Medicaid patients. Likewise, the other thing that they looked at was the number of hospital outpatient services per 1,000 beneficiaries over a three-year period and found that that didn't change even though the rates were cut and even though the number of beneficiaries went up. And again, this is equally consistent with hospitals just treating patients that they're required to treat under EMTALA who show up in the emergency room. And so that evidence says nothing about whether the rates themselves are adequate. And that's important, because we don't want to be putting hospitals out of business. We don't want to be causing emergency rooms to be shut. And so CMS needs to do some type of rational analysis to determine whether the rates for the outpatient services are adequate and would be adequate in the absence of EMTALA. Do you have a matrix that you propose the Secretary use to do an analysis that you believe would comply with Section 30A? Well, I think there are numerous things the Secretary could do. I mean, one thing they could do is instead of looking for my question specifically, have you proposed, do you have a matrix that you recommend that would be acceptable to you? I think they could compare the rates that Medicaid pays with the rates that private insurance pay or that Medicare pays, and that would be a rational way, if the rates were similar or higher, that would be a rational way of saying the access should be similar. I think there are probably other ways that CMS could come up with doing this. They might be able to hire an economist to do some sort of analysis. But it's not really up to us, and I don't think the law really allows us to tell CMS, here is how you have to do the analysis. No, I understand. I just, you know, you've got trains passing in the night here, and to the degree you can communicate with one another and know what's acceptable, it would be helpful, I assume. I mean, I would think the best way would be for them to compare the Medicaid rates with rates paid by other payers, including Medicare, and make sure that the rates are within the same range. That would be what I would view as being a reasonable way to do it. So unless there are additional questions, I'd like to reserve time for rebuttal. Please reserve the time if you'd like, counsel. Thank you, Your Honors. We'll hear from the government. I'm sure you have lots of good answers for us, right, counsel? Good morning. May it please the Court. Jeff Sandberg for the United States. The District Court properly upheld the Secretary's request for a plan amendment that expressly states her finding that the payments provided under the plan amendment were sufficient to meet the beneficiary access requirement at issue here in Section 38 of the Medicaid statute. Okay. Now, where in the record is the showing that the Secretary considered whether the proposed SBA would assure Medi-Cal beneficiaries that they would have equal access to care and services as the general public? I didn't find such an analysis. The Secretary relied on a few things, Your Honor. Part of it is the access study that the state had prepared at CMS's request, which focused on two main things. How many providers are participating in Medi-Cal, and has that number changed as a result of the challenge rate cut? And how, if at all, has utilization of Medi-Cal on a per capita basis changed as a result of the rate cut? Where is that in the record? That's at 1593 to 1599 of the excerpts of record is the state's access study. Where's the second part of the analysis where you compare the access of the Medicaid patients to the access that the general public enjoys? There are a number of inferences that can be drawn from the data that is discussed at 1593 to 1599. And the state's methodological papers talking about access analyses go through this in a little bit more detail. You might want to look at 1825 to 1826, which talks about utilization in particular. Honestly, Counsel, with respect, I find the analysis incredibly insipid. It doesn't answer the question, is my view. So I'm troubled by the fact that all you've got is relatively narrow reference to somebody else's study that I'm not sure exactly addresses what the statute talks about. Was there anything else that the Secretary did, any other kind of analysis that you can refer us to? Yes, I have a fair amount to say that I think is responsive to your question. So first of all, it's important to keep in mind that this was a three-year iterative process in which CMS repeatedly told the state, no, you haven't given me evidence I rely on. At one point, CMS said to the state, this was during the reconsideration process, here's some data that we would like to see that we would consider relevant. And one of the things it asked for was utilization trends over time, and another thing it asked for was whether provider participation had changed. Let's just talk about utilization for a moment. During the three-year period that the state studied, roughly a million people joined the Medi-Cal roles in the state of California. It was a time of recession, a number of people who used to be general population are now Medi-Cal beneficiaries.  How do you separate those two in your study, members of the general public versus Medi-Cal and the time period? So say 2009, 2010, things are getting tough, people migrate into the Medi-Cal coverage, are they members of the general public, or are they Medi-Cal, and if so, at what point? The phrase general population isn't defined by regulation or elsewhere, but as CMS has thought of it, as the state has thought of it, is generally we don't want Medi-Cal beneficiaries doing worse than other people in terms of their access to healthcare. We don't want private insurance systems or Medicare or people who are paying for healthcare themselves to have better access to doctors than others. So the utilization study here is actually very telling on this point. You have folks who used to be not on Medi-Cal, call them general population, they're now coming into the Medi-Cal system. Okay, you don't have the number of providers in the state going up at all. The number of providers has remained relatively constant during this period. So you've got more people you need to accommodate within the Medi-Cal system with essentially the same provider base. If Medi-Cal rates are not sufficient to induce providers to provide care to those additional people, you would expect that the per capita visits by Medi-Cal beneficiaries to doctors would be going down, but that's not what happened at all. What happened was per capita utilization remained constant through this three-year period, even though you've got a million new beneficiaries coming on the rolls and providers are also not dropping out. And CMS looked at this and both CMS and the state found this persuasive. With respect, I'm not a Ph.D. in math, but as you know, there's lots of anecdotal evidence about doctors and hospitals and pharmacies and so on dropping out of the Medi-Cal system. Again, it's not on the record, but I'm troubled by the fact that there doesn't seem to be an acknowledgment of any of that in the materials that you provided. The materials you provided seem to say everything's just great, everybody's wonderful, everybody's happy, lots of doctors, lots of people are willing to treat them. That's not what is being reported out there. With respect, I don't think that's quite right, Your Honor. CMS disapproved this state plan amendment initially because the state hadn't made any attempt to show in an evidentiary way that a 10% rate cut to hospitals was going to have no effect. So CMS required the state to go and gather some information that would be responsive to the question whether the plan amendment that's being challenged here was going to take the state out of compliance with Section 30A. And evidence that CMS requested was given to it by the state. CMS looked at it. Incidentally, the evidence that was relied upon here is substantially the same type of evidence that this court approved in managed pharmacy care. But that was a different part of the statute, was it not? No, it was Section 30A. I understand that. One part of it speaks a very general language. That's what Judge Berzon wrote about. But I don't think that addressed at all the equal access portion, did it? I don't think that's right. There were a few challenges brought in managed pharmacy care. I think it was actually four consolidated cases. So there were lots of claims made. All of the providers there said on the authority of this court's prior decision in orthopedic hospital, there were cost studies that were required. And in an earlier part of the managed pharmacy care decision, the court said, okay, we defer now to CMS's interpretation of the statute as not requiring cost studies. But there were also independent, arbitrary, and capricious challenges brought there. And I believe on the basis of the access prong of the statute and others. And this court looked at the evidence that CMS had relied on there, which included provider participation rates over time, per capita utilization over time, and the state's monitoring plan. And this court noted that that was the same types of evidence that the congressionally appointed Medicaid and CHIP Payment and Access Commission had recommended looking at, and found that it was not arbitrary and capricious for CMS to approve on that basis. So I think this court would have a very difficult time distinguishing. That's under managed pharmacy care, right? So I don't see how it would be easy for this court to distinguish its own analysis in managed pharmacy care relying on provider participation rates over time. Wasn't there a baseline comparison in that other case, the managed pharmacy care? I confess I don't know precisely what the reference to baseline utilization meant there, but I don't think it was the type of evidence that my adversary here is asking for. Because wasn't there some comparison in the managed pharmacy care between what the Medi-Cal folks were getting, the access that they were getting, and the access the general public was getting? I'm not confident of that, Your Honor, but I'm not aware that that evidence existed there in a way that differs meaningfully from what exists here. I mean, it's true, the secretary has to draw inferences, right? The state and CMS have a lot more information about government health care programs than they do about other insurance programs and private health information of people who are not participants in government programs. So the secretary has to draw inferences using its expertise based on the data for it. And when it sees that folks who used to not be in Medi-Cal, and who are now in Medi-Cal, are able to access, are getting visits at the same rate as the Medi-Cal people before, that's saying that Medi-Cal was able to absorb those beneficiaries. And that's not to say that a state can always cut rates in a way that won't impinge on access. CMS was deeply concerned here about whether there was going to be an access problem. But as it turns out, at least for hospital outpatient services in both metropolitan and non-metropolitan areas, there was no access problem. And my adversary concedes as much in his reply brief and says there actually was no decrease in access as a result of the... What you're saying makes perfect sense, except for the statute. So Congress passed Medicaid so poor people can get access to health care. You're saying that the way things were going in California, even during this time when the rates were cut, access was the same, utilization trends were fine, the number of providers stayed constant, so poor people were getting access to health care. Everything's great, but that's not the statute that Congress passed. Congress passed a statute saying that the secretary has to ensure that poor people get access that is equal to or better than access for the general public. And that statute requires that a comparison be made between Medi-Cal and the general public. So just because things are going fine with the Medi-Cal population, what if the general population has Sweden-like access or Denmark-like access to medical care? Then the comparison wouldn't work out. So no matter how well Medi-Cal was doing, if they're not doing as well as the general public, then the statute isn't satisfied. Would you agree with that? No, and there's a lot to respond to in there, I think. The first thing to keep in mind is that this court held in managed pharmacy care, that there's not a particular type of methodology that must be held here. There's not a particular comparison. I'm sorry to interrupt you, but let's go to the statute. The statute says that the state plan must be such that the quality of care is sufficient to enlist enough providers so that care and service that are available under the plan are available, at least to the extent that such care and services are available to the general public. Doesn't that require a comparison between Medi-Cal and the general public? It doesn't require any express, it doesn't require any particular data be looked at. Absolutely the secretary must make that finding. The secretary must conclude to her satisfaction or his satisfaction that the rates are sufficient to enlist enough providers so that Medicaid beneficiaries are getting care and services at least to the extent as others in the general population. That's absolutely true. How can you make that determination without evaluating what the access is for the general public? Because you only have one side of the comparison, you only have the Medi-Cal. There was no analysis at all of what Medi-Cal access was being compared to, which was the general public. And I think that's a stupid, and I think that's a dumb statute. I think that the way the secretary did it is fine, but for the fact that we have to follow the statute that Congress wrote. But the statute, as interpreted by this court and the vast majority of other courts of appeals that have looked at this, have not required the secretary to use any particular methodology to figure out how to satisfy that last prong. Absolutely the secretary must say the Medi-Cal beneficiaries are at least, if the general population is here, the Medi-Cal beneficiaries have to at least be here or higher. But the secretary can rely on both direct and circumstantial evidence in order to make that determination. But again, as my colleague suggests, where in the data does it show what access the general public has? Well, I think CMS is relying on its expert knowledge of health care here. And notionally the general population has, the idea of the statute is the general population generally is able to get to a doctor relatively quickly if they need to. Counsel, with respect, don't you have to have some evidence of what's available to the general public? No, I don't think you do. I don't think you need any particular type of evidence here. CMS is the one that is charged by Congress with implementing this statute. And there's evidence here that suggests that Medi-Cal beneficiaries are not doing worse than others. And that is enough. Under the standard of review set forth by this court in managed pharmacy care, that is enough. And it is not for plaintiffs to come in and second guess and say, well, really this type of data would be more probative or more reliable. That's exactly what the plaintiffs in managed pharmacy care tried to do. And in fact they had evidence in managed pharmacy care. Here plaintiffs just have hypotheticals. What if a hospital is only treating one patient a year in EMTALA? Like in the thousands of pages in the record here and all the materials submitted to CMS, there's no suggestion that hospitals are only seeing Medi-Cal beneficiaries because of EMTALA and not for other reasons. And, you know, the secretary also has to approve a plan amendment submitted by a state, by statute, 1396 A.B. CMS must approve the plan amendment unless it can be persuaded that the plan amendment doesn't comply with the statute. And so I would expect plaintiffs here, if they think that there was really an access problem, would have come forward with some evidence that hospitals are only participating. I gather it's your position that managed pharmacy expressly addresses the equal access to care and services question. Yes, it does, and it held that it was not arbitrary. What's the pin site? I would look at pages 1250 through 1251 of managed pharmacy care, where it notes, among other things, that the state's analysis there had relied on the rating of providers participating in Medi-Cal, total number of beneficiaries by type, utilization of services by type. There was also this benchmark service utilization. And with respect, as my colleague has pointed out, it misses the other half of the equation. Talked a lot about Medi-Cal, but it doesn't talk about the general public. I'm not seeing, I'd sure love to see where, I don't see where managed pharmacy talks about the general public. And I understand it talks about Medi-Cal, but I don't understand where it talks about the general public. The relevant difference between managed pharmacy care was the emphasis there was on you should have a cost study, and here now the plaintiffs are saying you should have a study of the general population. But this court's holding in managed pharmacy care says you don't get to tell the secretary what type of study she has to have. Again, absolutely the secretary must find that the care is at least... But the statute gives the language that governs. And the statute says you've got to see that one portion, that is the Medi-Cal folks, have equal access to the care and services of the general public. And you can't compare it unless you know what they are. I don't find that that's been done. Right. But the secretary at Excerpts of Record 2171 says, in light of the data CMS reviewed, the monitoring plan, and our consideration of stakeholder input, we have determined that these amendments comply with Section 30A and expressly lays out the language we've been talking about here. So, you know, the secretary made the judgment that you are looking for. I think we're at trains passing in the night, but we appreciate your argument. I'm probably going to beat a dead horse here, but I'm just going to do it because I... He's not saying you're a horse. Let's head dead horse. I want to agree with you, but I'm having a hard time. So let's say we're in a philosophy class in college, and it's a logic class. And a student writes a paper saying, okay, I have to prove that X is better than or equal to Y. And that's the proposition. And the student says, X is really, really good. And therefore, X is better than or equal to Y. Would that be a valid answer? No, but there we're talking about a pure question of logic rather than the administration of a scheme, a very complicated scheme by the entity that Congress has, you know, in 2010, you know, the general population suddenly gained Sweden or Denmark-like access to health care here. You know, CMS is operating in the real world based on the evidence before it. And what all that's being challenged here is a rate cut. They're saying that the rate cut violates Section 30A. And CMS said, okay, let's see if the rate cut caused any problems. And it didn't. It didn't cause any access problems. And that certainly seems like a reasonable and, in any event, not arbitrary and capricious line of reasoning to me. And certainly I think the standards of the EPA would compel this Court to reach the same conclusion. Thanks for bearing with me. Thank you very much. I basically have nothing to add to the arguments I previously made, but if there are questions. You don't have to continue to argue. Sometimes that's the most effective argument you can have. So unless there are questions, I think I'm certainly done. Thank you. Thank you very much to both of you.
judges: M. Smith, N.R. Smith, Feinerman